THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RODERICK R. OWENS, Defendant-Appellant.

Second District    No. 2—00—0574

Opinion filed July 11, 2001.

Robert S. Hirschhorn, of Skokie, and Steven Hunter, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of

State's Attorneys Appellate Prosecutor's Office, of counsel), and Catherine A. Voigt, of Glen Ellyn, for the People.

JUSTICE GROMETER delivered the opinion of the court:

Defendant, Roderick R. Owens, was charged by indictment with making a false report of a vehicle theft (625 ILCS 5/4—103(a)(6) (West 1996)) and insurance fraud (720 ILCS 5/46—1 (West 1996)). A bench trial was held in the circuit court of Lake County. At the close of the State's evidence, the court directed a finding in defendant's favor on the charge of insurance fraud. Subsequently, the court found defendant guilty of making a false report of a vehicle theft. The court sentenced defendant to a 6-month term of imprisonment and a 30-month term of probation. The trial court also ordered defendant to pay $19,468 in restitution to his insurer.

On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of making a false report of a vehicle theft. Defendant also argues that the trial court was not authorized to order him to pay restitution. For the reasons that follow, we affirm defendant's conviction but vacate that portion of the sentence ordering defendant to pay restitution.

## I. BACKGROUND

On June 10, 1998, defendant was indicted for making a false report of a vehicle theft (625 ILCS 5/4—103(a)(6) (West 1996)) and insurance fraud (720 ILCS 5/46—1 (West 1996)). The cause proceeded to a bench trial in which the following testimony was presented.

Officer Michael Young of the Gurnee police department testified that at approximately 3:50 p.m. on September 21, 1997, defendant reported the theft of his vehicle to the Gurnee police department. Young further testified that defendant described his car as a red 1991 Chevrolet Corvette convertible with a white top. Defendant told Young that he owned the vehicle outright and that it was insured with State Farm. Defendant also told Young that the car bore license plate number B804549. Young did not request a vehicle identification number (VIN) from defendant. However, Young testified that he was able to locate the VIN by running a computer search of the license plate number provided by defendant.

Illinois State Trooper Joseph Perez testified that he was assigned to investigate a discrepancy in the report of the theft of a 1991 red Corvette that was filed with the Gurnee police department. Perez's investigation revealed that the vehicle in question was in the possession of Robert Spurling.

Thomas Stancey testified that in April 1994 he purchased a 1991 red Chevrolet Corvette convertible from Hinsdale Motor Cars. Stancey

did not recall the automobile's VIN. However, according to the bill of sale, the VIN was 1G1YY3385M5109151. Stancey financed the vehicle through La Salle Northwest National Bank and made his last payment on the car in April 1997. However, he never received title to the vehicle. On or about May 13, 1997, Stancey placed his car with D&M Corvette Specialists (D&M), a business that sells Corvettes on consignment.

The State introduced into evidence a certificate of title for a red 1991 Chevrolet Corvette convertible. The certificate of title was in the name of Stancey and his wife, Veronica. On the reverse of the certificate was a handwritten assignment of title to a Roderick Owens dated May 29, 1997. The assignment of title was purportedly signed by Stancey and his wife. However, Stancey testified that the signatures did not belong to him or his wife and that the mileage indicated on the assignment of title (39,519) was incorrect.

David Glass of D&M testified that Robert Spurling purchased the Stancey Corvette in September 1997 for approximately $22,000. According to Glass, prior to its sale, D&M displayed the Corvette in an indoor showroom that was locked at night. Glass stated that, when Stancey brought the Corvette to D&M, he did not furnish a title for the vehicle. However, Glass, Stancey, and Spurling worked with the Secretary of State to obtain a title. Glass stated that he does not know defendant and that he never sold a car to him. On cross-examination, Glass admitted that prospective customers probably took the Corvette for a test-drive. However, he stated that a salesperson always accompanies customers on test-drives.

Robert Spurling testified that on September 10, 1997, he purchased a red Corvette convertible with a white top from D&M. Spurling did not obtain the title to the vehicle at the time of purchase. However, about one year after the purchase, he received a duplicate title to the automobile. Spurling testified that he keeps the car in the garage of his Ogle County residence, except in winter, when he stores the vehicle in his brother-in-law's barn in Tampico, Illinois.

Fred Plohm, an officer with the Secretary of State Police, testified that in 1997 Stancey initiated a complaint in reference to a missing title to his red 1991 Chevrolet Corvette. Plohm began his investigation by ordering a chain of title to the vehicle. Plohm testified that a certificate of title for the Corvette had first been issued to Geraldine Mennen. Mennen assigned the title to Hinsdale Motor Cars, Inc. Hinsdale Motor Cars assigned the title to Stancey and his wife, with a lien in favor of La Salle Northwest National Bank. A certificate of title was issued in the name of Stancey and his wife. On the back of the certificate of title issued to the Stanceys, there was an assignment of title,

dated May 29, 1997, to a Roderick Owens, 1750 N. Madison Street, Maywood, Illinois. On June 17, 1997, the Secretary of State issued a certificate of title for the vehicle in the name of Roderick Owens. Plohm testified that each of the aforementioned certificates of title were for the same vehicle and listed the same VIN.

Based on his investigation into the vehicle's chain of title, Plohm sent notices to Stancey and Owens. Stancey contacted Plohm regarding the vehicle. Plohm attempted to go to Owens' Maywood address, but discovered that it did not exist. Plohm was also unable to contact Owens at an Aurora address that he had provided on one of the title documents. Plohm then contacted D&M and Stancey and instructed them to take the Corvette to a Secretary of State facility for inspection. At the time of inspection, the vehicle's odometer read 27,988 miles. After the inspection, Plohm concluded that the vehicle bore an original, unaltered VIN tag. At the conclusion of his investigation, Plohm concluded that the Corvette belonged to the Stanceys and that Owens fraudulently obtained his certificate of title. The Secretary of State revoked Owens' certificate of title and issued a duplicate certificate in the Stanceys' name.

Steve Studzinski, Jr., a special investigator for the American Ambassador Insurance Company (American Ambassador), testified that American Ambassador issued an automobile insurance policy to defendant. On August 19, 1997, defendant added a 1991 Chevrolet Corvette to the policy. Studzinski explained that when a policyholder reports the theft of a vehicle, American Ambassador sends the policyholder a packet containing an affidavit of automobile total theft. The policyholder must complete the affidavit, have it notarized, and return it to American Ambassador before it will issue a settlement check.

Admitted into evidence was an affidavit of automobile total theft received by American Ambassador with the name of Roderick Owens listed as the policyholder. According to the affidavit, on September 21, 1997, a red 1991 Chevrolet Corvette convertible with a white top was stolen from a parking lot at the Gurnee Mills Mall. The affidavit listed the vehicle's license plate number as B804549 and its VIN as 1G1YY3385M5109151. The affidavit indicated that the vehicle had been purchased for $22,000 from Kenneth Potts of Oak Park, Illinois, on May 29, 1997. On November 13, 1997, American Ambassador issued a settlement check to Roderick Owens in the amount of $19,468. Studzinski testified that the check was cashed the following day.

On cross-examination, Studzinski testified that the affidavit of automobile total theft is blank when it is mailed to the insured and that the packet containing the affidavit would be sent to the address

of the insured as it is listed on the policy. Studzinski admitted that he did not know if defendant was the individual who completed the affidavit. In addition, Studzinski acknowledged that he did not know who cashed the settlement check issued by American Ambassador.

At the close of the State's evidence, defendant moved for a directed finding with respect to both counts. The trial court denied defendant's motion with respect to the charge of making a false report of a vehicle theft but granted defendant's motion with respect to the charge of insurance fraud. The court determined that the State failed to present sufficient evidence that defendant was the individual responsible for submitting the affidavit of automobile total theft to American Ambassador or that defendant had received the settlement check.

Defendant's first witness was his mother, Geraldine Dollee. Dollee testified that in June 1997 defendant took her for a ride in a red Corvette with a white top. Dollee saw defendant in the Corvette on approximately three other occasions. Dollee stated that she did not check the vehicle's VIN and she did not recall whether the car was a convertible, whether the car carried license plates, or the type of wheels the car had.

Josie Willingham, defendant's grandmother, testified that during the summer of 1997 defendant would often come to visit her. According to Willingham, on at least a couple of occasions, she observed defendant driving a red car with a white top and a "long nose."

Defendant testified that he owned a 1991 red Chevrolet Corvette convertible before it was stolen on September 21, 1997. According to defendant, on that date, he accompanied his girlfriend and some of his girlfriend's relatives to Gurnee Mills Mall. Defendant and his girlfriend drove in a Corvette while his girlfriend's relatives drove in a Buick Century. The group arrived at the mall at about 10:30 a.m. and parked in lot B. At approximately 2 p.m., defendant went to his vehicle to drop off some packages. He then continued shopping until about 3 p.m. At that time, defendant returned to the parking lot and discovered that his vehicle was missing.

Defendant testified that he immediately reported the theft to a mall security officer. The security officer told defendant to file a police report. Accordingly, defendant's girlfriend's mother drove him to the Gurnee police department. Defendant entered the police station with his girlfriend. He spoke with Officer Young in a conference room. He provided Young with information regarding the Corvette's physical characteristics. However, defendant testified that Young never asked him for the car's VIN and that, in any case, he did not memorize the VIN.

Defendant then testified as to how he acquired the Corvette. De-

fendant explained that in May 1997 he was involved in a vehicle collision with a man who identified himself as Thomas Stancey. After the accident, Stancey told defendant that he was a "body man" and that he could repair defendant's vehicle, a 1993 GMC Typhoon. Accordingly, defendant took his vehicle to Stancey's shop. At some point, Stancey told defendant that he could not afford to fix the Typhoon. Stancey then offered defendant his choice of several vehicles at the shop. Defendant selected a 1991 red Chevrolet Corvette convertible with a white top. In exchange for the Corvette, defendant agreed to give Stancey his Typhoon and $6,000 in cash.

Defendant testified that he took possession of the Corvette on May 24, 1997. Stancey accompanied defendant to a currency exchange in Aurora where they completed some title documents, including the assignment of title. According to defendant, he received the certificate of title for the Corvette on June 2, 1997. Defendant testified that he never checked the VIN on his vehicle against the VIN listed on the certificate of title.

On cross-examination, defendant stated that he paid $22,000 for the Typhoon. However, he later indicated that he paid only $19,000 for the vehicle. He also stated that he installed $3,500 worth of stereo equipment on the vehicle. In addition, defendant acknowledged that he never completed a police report for the accident with Stancey. He also testified that American Ambassador issued an insurance policy for the Typhoon but that he did not report the accident to the insurer. Defendant stated that at the time of the accident he was with a friend. However, he did not recall what happened to his passenger after the accident. Defendant could not recall the exact date of the accident or the location of Stancey's body shop. Defendant testified that the Corvette had 39,000 miles on it when he bought it. Defendant stated that the currency exchange where he and Stancey executed the title was in Crestwood.

Defendant also admitted that he completed an affidavit of automobile total theft and returned it to American Ambassador. The affidavit states that defendant purchased the Corvette from Kenneth Potts of Oak Park, Illinois, on May 29, 1997. The affidavit further states that defendant paid $22,000 for the vehicle. On redirect examination, defendant explained that Potts is an agent for Stancey's body shop and that he was the individual that physically handed defendant title to the vehicle.

Following closing arguments, the trial court found defendant guilty of making a false report of a vehicle theft. The court found that defendant's testimony was inconsistent and incredible. The court sentenced defendant to 6 months' imprisonment and 30 months'

probation. In addition, the court ordered defendant to pay American Ambassador $19,468 in restitution, payable in monthly installments of $150. The trial court denied defendant's motion to reconsider sentence, and this timely appeal followed.

## II. ANALYSIS

### A. Reasonable Doubt

Defendant first argues that the State failed to prove beyond a reasonable doubt that he knowingly made a false report of a vehicle theft. Defendant divides his argument into two separate parts. First, he notes that section 4—103(a)(6) of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/4—103(a)(6) (West 1996)) requires the State to prove beyond a reasonable doubt that a person "knowingly [made] a false report of the theft *** of a vehicle." Relying principally upon *People v. Tolliver*, 147 Ill. 2d 397 (1992), and *People v. DePalma*, 256 Ill. App. 3d 206 (1994), defendant asserts that a conviction under section 4—103(a)(6) requires the State to prove that he acted with "criminal knowledge," *i.e.*, knowledge plus criminal purpose. Second, applying the "criminal knowledge" requirement to the facts of this case, defendant insists that the State did not prove him guilty beyond a reasonable doubt.

The State urges this court to reject defendant's contention that section 4—103(a)(6) of the Vehicle Code requires it to prove that a defendant acted with "criminal knowledge." The State argues that the plain language of section 4—103(a)(6) requires only that a defendant act knowingly, *i.e.*, that a defendant know the report was false. The State also disputes defendant's contention that it did not prove him guilty beyond a reasonable doubt. The State argues that it linked defendant to the Stancey Corvette through the information defendant provided the Gurnee police department, *i.e.*, the physical description of the vehicle and its license plate number. Through this information, the State obtained the VIN. The State also points out that it presented testimony regarding the vehicle's chain of title and that the assignment of title to defendant was fraudulent.

●1 We begin by determining the appropriate mental state applicable to section 4—103(a)(6) of the Vehicle Code. The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Wett*, 308 Ill. App. 3d 729, 734 (1999). When an enactment is clear and unambiguous, we may not depart from the meaning of the plain language of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express. *Wett*, 308 Ill. App. 3d at 734.

●2 Section 4—103 states in pertinent part:

"(a) It is a violation of this Chapter for:

* * *

(6) A person to knowingly make a false report of the theft or conversion of a vehicle to any police officer of this State." 625 ILCS 5/4—103 (West 1996).

The plain language of the statute does not support defendant's interpretation. The legislature clearly and unambiguously supplied "knowledge" as the applicable mental state for a violation of section 4—103(a)(6).

Indeed, our supreme court recently reaffirmed the principle that, where the legislature expressly supplies a statute with a mental state, a court must enforce the statute as written. In *People v. Wright*, 194 Ill. 2d 1 (2000), our supreme court found section 5—401.2 of the Vehicle Code (625 ILCS 5/5—401.2 (West 1996)) unconstitutional on due process grounds. *Wright*, 194 Ill. 2d at 30. Section 5—401.2 required certain individuals licensed under the Vehicle Code to maintain for three years at their place of business certain records relating to the acquisition and disposition of vehicles and parts. 625 ILCS 5/5—401.2 (West 1996). The statute also provided that "[a]ny person who knowingly fails to keep the records required by this Section or who knowingly violates this Section shall be guilty of a Class 2 felony." 625 ILCS 5/5—401.2(i) (West 1996).

As noted above, the court determined that section 2—401.2 of the Vehicle Code was unconstitutional. In so holding, however, the court rejected the defendant's invitation to follow its decision in *Tolliver*, 147 Ill. 2d 397, and read into section 5—401.2 the mental state of knowledge plus criminal purpose. *Wright*, 194 Ill. 2d at 29. The court explained that it was able to imply the mental state of knowledge plus criminal purpose in *Tolliver* because the section of the Vehicle Code at issue in that case lacked a mental state entirely and the legislature did not intend to create an absolute liability offense. *Wright*, 194 Ill. 2d at 29. However, in promulgating section 5—401.2, the legislature expressly and unambiguously provided the mental state of simple knowledge. *Wright*, 194 Ill. 2d at 29-30. As in *Wright*, the legislature supplied a mental state for the statute at issue in this case. Consequently, we are bound to enforce the statute as written.

Defendant, however, citing to *Tolliver*, 147 Ill. 2d 397, and *DePalma*, 256 Ill. App. 3d 206, insists that a conviction under section 4—103(a)(6) of the Vehicle Code requires the State to prove more than mere knowledge; it requires the State to prove knowledge that the report was false plus criminal purpose. However, both *Tolliver* and *DePalma* are distinguishable from the facts of this case.

In *Tolliver*, 147 Ill. 2d 397, the defendant was charged with pos-

session of title without complete assignment. Ill. Rev. Stat. 1989, ch. 95½, par. 4—104(a)(2). The defendant filed a motion to dismiss, claiming that the statute was unconstitutional. The statute at issue in *Tolliver* did not include a particular mental state. However, the supreme court noted that in *People v. Gean*, 143 Ill. 2d 281 (1991), it held that, because the statute does not create an absolute liability offense, it would read into the statute the mental state of knowledge. *Tolliver*, 147 Ill. 2d at 400. Elaborating on *Gean*, the supreme court in *Tolliver* determined that the "knowledge" required for a conviction under section 4—104 of the Vehicle Code must be expanded to include "criminal knowledge" or "knowledge plus criminal purpose." *Tolliver*, 147 Ill. 2d at 400, 403. The court explained that there are many situations in which a person could knowingly possess an incomplete title for entirely innocent reasons, yet be punished as a felon despite the lack of a criminal intent. *Tolliver*, 147 Ill. 2d at 401-02.

In *DePalma*, the defendant was convicted of possession of a vehicle with knowledge that the VIN had been removed. The statute under which the defendant was convicted made it a felony to "buy, receive, possess, sell or dispose of a vehicle, or any essential part thereof, with knowledge that the identification number of the vehicle or any essential part thereof having an identification number has been removed or falsified." Ill. Rev. Stat. 1991, ch. 95½, par. 4—103(a)(4). On appeal, the defendant challenged the constitutionality of section 4—103(a)(4), arguing, *inter alia*, that the statute criminalizes innocent conduct.

Although we ultimately reversed defendant's conviction, we did not find section 4—103(a)(4) of the Vehicle Code unconstitutional for criminalizing innocent conduct. *DePalma*, 256 Ill. 2d at 214. Rather, relying on *Tolliver*, we found the statute constitutional, concluding that the knowledge requirement of section 4—103(a)(4) must be read to mean "criminal knowledge." *DePalma*, 256 Ill. App. 3d at 211. We also noted that chapter 4 of the Code was implemented " ' "to protect automobile owners against theft and to protect the general public against the commission of crimes involving stolen automobiles." ' " *DePalma*, 256 Ill. App. 3d at 209, quoting *People v. Morris*, 136 Ill. 2d 157, 162 (1990), quoting *People v. One 1979 Pontiac Grand Prix Automobile*, 89 Ill. 2d 506, 510 (1982). We reasoned that a contrary result would abrogate the legislative purpose of the statute by punishing a person with no criminal purpose who came into possession of a vehicle without a VIN. *DePalma*, 256 Ill. App. 3d at 212.

The statutes at issue in both *Tolliver* and *DePalma* permitted a defendant to be found guilty of passive conduct, *i.e.*, mere knowing possession. See *People v. Mayhall*, 291 Ill. App. 3d 650, 654 (1997)

(recognizing that *Tolliver* and *DePalma* involved offenses based solely on a person's possession of an improper item). Indeed, both courts cited several situations under which innocent persons could be convicted for conduct lacking any criminal intent. See *Tolliver*, 147 Ill. 2d at 401-02; *DePalma*, 256 Ill. App. 3d at 212. In contrast, a violation of section 4—103(a)(6) involves affirmative conduct, and unlike the courts in *Tolliver* and *DePalma*, we cannot envision any scenario under which the statute would punish innocent conduct. In addition, defendant has not suggested such a scenario.

Moreover, we note that *Tolliver* is distinguishable on an entirely separate basis. As it noted in *Wright*, the supreme court was able to imply the mental state of knowledge plus criminal purpose in that case because the statute lacked any mental state and the legislature did not intend to create an absolute liability offense. *Wright*, 194 Ill. 2d at 29. As we previously discussed, the legislature supplied the mental state of "knowledge" for a violation of section 4—103(a)(6).

We now turn to the second part of defendant's argument. Defendant contends that applying the "criminal knowledge" standard to this case leads to the conclusion that he was not proved guilty beyond a reasonable doubt of making a false report of a vehicle theft. However, because we have already rejected defendant's contention that a mental state of "criminal knowledge" applies to section 4—103(a)(6) of the Vehicle Code, we confine our analysis to whether the State proved that defendant knowingly made a false report of a vehicle theft.

Defendant does not dispute that he never owned or had possession of the car described in the indictment. Rather, he maintains that he owned a different Corvette with the same description, one which his witnesses identified as being in his possession. He points out that the State attempted to connect him with the instant offense through the Corvette's VIN. However, defendant claims that he never supplied the police with a VIN. Instead, the police discovered the VIN by running a computer search of the license plate number provided by defendant. Consequently, defendant reasons that he was convicted not of providing false information to the police but of somehow knowing that the information added to his report by the police was false.

●3 In reviewing the sufficiency of the evidence to support a conviction, the proper inquiry is whether the evidence, when viewed in a light most favorable to the prosecution, is such that any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Wright*, 194 Ill. 2d at 19. Section 4—103(a)(6) of the Vehicle Code makes it unlawful for "[a] person to knowingly make a false report of the theft *** of a vehicle to any police officer of this State." 625 ILCS 5/4—103 (West 1996). Defendant suggests that,

under the facts in this case, there are only two situations in which a report of a vehicle theft would be false: (1) the vehicle he reported stolen was never actually stolen, *i.e.*, he still possessed the vehicle; or (2) he never owned the vehicle. Defendant notes that there was no evidence that he retained the vehicle, and he insists that he owned a vehicle fitting the description of the Corvette he reported stolen. However, we conclude that the evidence presented at trial was sufficient to prove that defendant never owned the Corvette he reported stolen. Thus, we find that the State proved defendant guilty beyond a reasonable doubt of making a false report of a vehicle theft.

At trial, the State proffered evidence regarding defendant's claim that he owned a 1991 white-topped, red Corvette convertible that was stolen. Defendant provided Officer Young with a physical description of the vehicle and the vehicle's license plate number. Using the license plate number, Young was able to run a computer search to locate the Corvette's VIN. Law enforcement officials subsequently learned that the Corvette in question was in the possession of Robert Spurling.

The State also presented substantial evidence regarding the Corvette's chain of title. This evidence suggested that defendant never owned the Corvette that he claimed was stolen from his possession.

Stancey testified that he purchased the Corvette in April 1994 from Hinsdale Motor Cars and financed the vehicle through La Salle Northwest Bank. According to the vehicle's bill of sale, its VIN was 1G1YY3385M5109151. Stancey made his last car payment in April 1997 but never received a title. In May 1997, Stancey placed the vehicle for sale with D&M. D&M sold the car to Robert Spurling in September 1997. Spurling testified that he still owned the automobile and possessed a duplicate title. Thus, the State established that Spurling was the legal owner of the Corvette at the time defendant reported the car stolen.

In addition, the State presented testimony that the title allegedly assigned to defendant from the Stanceys was fraudulent. Officer Plohm ordered a chain of title for the Corvette. Plohm noted that on the back of the certificate of title issued to the Stanceys was an assignment to defendant. However, Stancey testified that the signatures did not belong to him or his wife and that the mileage indicated on the assignment of title was incorrect. A certificate of title in the name of Roderick Owens was issued in June 1997. Plohm testified that each of the certificates of title was for the same vehicle and listed the same VIN.

Plohm then sought the assistance of Stancey and Owens regarding the chain of title. Stancey cooperated with Plohm's investigation. However, Plohm testified that the address defendant listed on the certificate of title did not exist and that he was not able to contact defen-

dant at an Aurora address that defendant had provided on one of the title documents. Plohm then inspected Stancey's Corvette and concluded that the vehicle bore an original, unaltered vehicle tag.

· Based on this evidence, the trial court could properly conclude that defendant knew the report he made was false because he claimed ownership of a vehicle he never owned.

Defendant claims that, while he did not have the car with the VIN identified in the indictment, he did have a car of the same physical description. He insists that because he did not provide police with a VIN the evidence was insufficient to support his conviction. We disagree. Although defendant did not provide police with the Corvette's VIN, he did provide police with a license plate number. As we discussed above, the police were able to use the license plate number to locate the Corvette's VIN and to connect defendant to the offense. The only way to find defendant's theory credible is to believe that, although defendant gave police the wrong license plate number, the license plate number defendant provided miraculously belonged to a vehicle of the same make, the same year, the same color, and the same style. We believe that the trial court was justified in declining to so conclude.

Defendant also cites the uncontradicted testimony of his mother and grandmother in support of his theory that he owned a 1991 red Corvette convertible. However, the testimony from these two witnesses, especially defendant's grandmother, was vague. We note that it is the function of the trier of fact to assess the credibility of the witnesses and to determine the weight to be given their testimony. *People v. Carini*, 254 Ill. App. 3d 1, 12 (1993). Further, the trier of fact is not required to accept the testimony of a defense witness even if it is uncontradicted. *Carini*, 254 Ill. App. 3d at 12; *People v. Kane*, 136 Ill. App. 3d 1030, 1034 (1985) (noting that the trier of fact is not required to accept the testimony of a defense witness on faith alone). In light of the other testimony and evidence presented by the State, the court was free to reject the testimony of defendant's mother and grandmother.

## B. Restitution

Defendant also argues that the portion of the court order requiring him to pay restitution should be reversed. Defendant presents three reasons in support of his argument. First, he asserts that the restitution order was premature because the court failed to hold the statutorily required hearing regarding defendant's ability to pay restitution. See 730 ILCS 5/5—5—6 (West 1996). Second, defendant argues that the trial court erred in imposing the restitution order based on charges that were unrelated to the sole charge of which he

was convicted. Third, defendant contends that, because American Ambassador was not a victim of the offense of which he was convicted, it was not a proper entity to receive restitution.

The State concedes that a sentence for restitution may not be imposed under section 5—5—6 of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5—5—6 (West 1996)) for offenses under the Vehicle Code. See *People v. Hasprey*, 194 Ill. 2d 84 (2000). However, relying in part on language in *Hasprey*, the State contends that a restitution order could be imposed under section 4—108(b) of the Vehicle Code (625 ILCS 5/4—108(b) (West 1996)).

●4 In this case it is unclear whether the trial court imposed its restitution order under section 5—5—6 of the Unified Code or under section 4—108(b) of the Vehicle Code. The distinction is irrelevant for our purposes, however, since we find that, under the facts of this case, the trial court could not impose the order of restitution under either statutory provision.

In *Hasprey*, 194 Ill. 2d 84, the defendant was convicted of reckless driving (625 ILCS 5/11—503 (West 1998)), sentenced to probation, and ordered to pay a fine, costs, and restitution. On appeal, our supreme court held that section 5—5—6 of the Unified Code authorizes restitution only for violations of the Criminal Code. *Hasprey*, 194 Ill. 2d at 86. Accordingly, the court vacated the trial court's restitution order, which was premised on the defendant's conviction under the Vehicle Code. *Hasprey*, 194 Ill. 2d at 86. Thus, pursuant to *Hasprey*, defendant, who was convicted of an offense under the Vehicle Code, could not be ordered to pay restitution under section 5—5—6 of the Unified Code.

Moreover, we point out that, while a conviction for insurance fraud (720 ILCS 5/46—1 (West 1996)) is a violation under the Criminal Code, defendant was acquitted of that charge. It is well established that a court may not impose restitution for charges upon which a defendant is acquitted. See *People v. Mahle*, 57 Ill. 2d 279, 284 (1974); *People v. Hernandez*, 236 Ill. App. 3d 983 (1992); *People v. Chapin*, 233 Ill. App. 3d 28 (1992). Thus, the trial court could not order defendant to pay restitution under section 5—5—6 of the Unified Code based on the insurance fraud charge.

In its decision, the *Hasprey* court mentioned that the Vehicle Code has its own "restitution provision" for those convicted of vehicle theft (see 625 ILCS 5/4—108 (West 1996)). *Hasprey*, 194 Ill. 2d at 86. The State seizes upon this language to argue that the trial court could impose a sentence of restitution pursuant to section 4—108 of the Vehicle Code. That section provides in pertinent part:

"(b) Any person who is convicted of any offense under Chapter 4

of this Act, in addition to any other fines or penalties provided therein, may be required to compensate the victim, if known, involved in the related offense, for any loss that the victim sustains to his person or property.

(c) The amount and method of payment of the compensation award shall be determined at the time of the conviction.

(d) For purposes of this Section, 'victim' shall mean the owner or other legally entitled person." 625 ILCS 5/4—108 (West 1996).

The State argues that section 4—108 is applicable here because defendant was convicted of a violation of chapter 4 of the Vehicle Code. Further, the State contends that American Ambassador is a victim in this case because it incurred a loss in paying defendant $19,468 to settle his claim.

Our research discloses only one case that analyzes section 4—108. In *People v. Fox*, 298 Ill. App. 3d 926 (1998), the defendant was convicted of possession of a stolen motor vehicle (625 ILCS 5/4—103(a)(1) (West 1996)), a violation of the Vehicle Code. The trial court imposed a sentence that included $500 in restitution. On appeal, the defendant argued that a sentence of restitution under section 5—5—6 of the Unified Code could not be imposed for the conviction of an offense under the Vehicle Code. In a case that predates *Hasprey*, the *Fox* court noted that the plain language of section 5—5—6 of the Unified Code authorizes a sentence of restitution only for violations of the Criminal Code. *Fox*, 298 Ill. App. 3d at 929.

In *Fox*, the State also urged the appellate court to uphold the defendant's sentence of restitution under section 4—108 of the Vehicle Code. The State insisted that, although the trial court characterized its award as one for "restitution," rather than for "compensation" as provided for in section 4—108 of the Vehicle Code, the distinction was irrelevant. However, the court rejected the State's claim, concluding that adopting the State's position would require it to "interchange two distinct sets of laws *** and two separate statutory penalty provisions *** and, thereby, permit, by judicial decision, the very acts that the legislature codified separately." *Fox*, 298 Ill. App. 3d at 930-31. In addition, the court noted that there was no support in the record for the amount of damages imposed by the trial court. *Fox*, 298 Ill. App. 3d at 931.

The State argues that the validity of the *Fox* holding is questionable in light of the *Hasprey* court's statement that the Vehicle Code has its own "restitution provision" for those convicted of vehicle theft (see 625 ILCS 5/4—108(b) (West 1998)). The *Hasprey* court's statement constitutes *dicta*. More importantly, however, the supreme court did not analyze section 4—108(b) because the defendant was convicted of reckless driving. See *Hasprey*, 194 Ill. 2d at 86.

Moreover, although defendant was charged with a violation of the Vehicle Code, we believe that under the facts of this case, the trial court could not order defendant to pay restitution to American Ambassador under section 4—108 of the Vehicle Code. The State's contention that American Ambassador is the victim in this case because it paid defendant $19,468 to settle his claim is unpersuasive. In acquitting defendant of the insurance-fraud charge, the court specifically found that the State failed to present sufficient evidence to establish that charge beyond a reasonable doubt. At the time of the acquittal, the court noted that there was no direct testimony that defendant was the individual who submitted the affidavit of automobile total theft to American Ambassador or that defendant had received the settlement check of $19,468. Although defendant later admitted submitting the affidavit, and American Ambassador may have been defrauded of $19,468 as a result of the acquittal, there was no basis in the record for the court to hold defendant responsible for this misconduct. Accordingly, we hold that, under the facts of this case, the trial court could not impose a sentence of restitution under section 4—108(b) of the Vehicle Code.

## III. CONCLUSION

For the aforementioned reasons, we affirm defendant's conviction but vacate that portion of the sentencing order requiring defendant to pay American Ambassador $19,468 in restitution.

Affirmed; restitution order vacated.

McLAREN and GEIGER, JJ., concur.